IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL ACTION NO. |
| | : | 1:20-cr-00196-LMM-JSA |
| | : | |
| ISMAEL GUERRERO-MOYA, et al., | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## **ORDER**

On March 18, 2020, Georgia State Patrol ("GSP") troopers and other

officers working with the U.S. Drug Enforcement Administration ("DEA")

stopped and searched a Ford Fusion driven by defendant Mariela Hernandez,

found methamphetamine, and obtained statements from Hernandez. The matter

is presently before the Court on the Magistrate Judge's Report and

Recommendation ("R&R"), Dkt. No. [295], recommending denial of Hernandez's

motions to suppress the fruits of the warrantless vehicle search and to suppress

statements she made to law enforcement, Dkt. Nos. [127, 128, 242]. Hernandez

has filed objections to the R&R. Dkt. No. [299]. After due consideration, the

Court **OVERRULES** the objections, **ADOPTS** the Magistrate Judge's

recommendations, **GRANTS** Hernandez's motions in part and **DENIES** them in part, and **SETS** the case for trial.[1]

## I.    BACKGROUND

On September 28, 2021, the Magistrate Judge held an evidentiary hearing on Hernandez's motions, Dkt. No. [276, 278], and the parties submitted post-hearing briefs, Dkt. Nos. [282, 287, 288].[2] On January 28, 2022, the Magistrate Judge entered an R&R in which he recommended that Hernandez's motion to suppress the fruits of the vehicle search be denied and that her motions to suppress her statements to law enforcement be granted in part and denied in part. Dkt. No. [295]. The R&R concluded that at the time of the traffic stop there was probable cause to believe that the Fusion and its occupants "had just been involved in, and were still involved in, a drug trafficking transaction" and that an investigatory stop and subsequent search were therefore justified. Id. at 15-18.[3] The Magistrate Judge cited a series of facts in support of this conclusion: wiretapped calls between co-defendant Ismael Guerrero-Moya ("Guerrero") and

---

[1]        Also pending is a motion to suppress statements that was filed by defendant Michael Childers. Dkt. No. [153]. The motion will be addressed at a date closer to trial.

[2]        Where a document's original page numbering is inconsistent with the page numbering assigned by the Court's electronic filing system, the Court uses the page numbers assigned by its system.

[3]        The Magistrate Judge also acknowledged that GSP Trooper Anthony Munoz testified that speeding supplied an independent basis for stopping the Fusion, but he found that the speeding issue was immaterial because Trooper Munoz had knowledge of drug-trafficking activity sufficient to justify the traffic stop. Dkt. No. [295] at 17 n.3.

co-defendant Maria Elidia Cornejo ("Cornejo"), an unknown male identified as "UM122,"[4] and another man identified as "UM637," indicating that a narcotics transaction would take place on March 18, 2020, wherein Cornejo and another female courier would bring loads of narcotics back and forth across Atlanta between UM122 and UM637; surveillance confirming that Cornejo was picked up and driven around; physical and electronic surveillance confirming Cornejo's exact movements, including when she was riding in the Fusion with the other courier; surveillance confirming that Cornejo and the courier went to UM122's location, then to UM637's location, as described in the wiretapped phone calls; surveillance confirming that a large container was taken out of the Fusion's trunk and brought into a residence where UM637 was believed to be processing methamphetamine; and a subsequent wiretapped call from Cornejo to Guerrero reporting that the transaction was successful and discussing the plan to pay the Fusion driver $2,000. Id. at 2-6, 15-18. The Magistrate Judge additionally noted that this evidence and his conclusion that probable cause existed were consistent with two other pieces of evidence: DEA Special Agent Andrea Boone's testimony that agents had seen the man at UM637's location who had removed the large container from the Fusion's trunk then replace the container with another container, and an electronic message shared among the agents just after the traffic stop noting that they had intercepted another call between Guerrero and

---

[4]     The "UM" designation refers to "unknown male." Dkt. No. [278] at 38-39. UM122 was later identified as co-defendant Childers. Id. at 50.

3

UM637 that indicated that UM637 had sent suspected drugs with Cornejo in the Fusion. Id. at 17.

Although the Magistrate Judge concluded specifically that officers otherwise had probable cause to stop and search the vehicle, he also found that a GSP narcotics-canine's positive drug sniff independently established probable cause. Id. at 18. He noted that the canine had been certified to detect odors of methamphetamine and other narcotics, that the canine and its handler had successfully completed ongoing training, and that there was no evidence in the record to suggest that the canine's training or the methods used during the stop rendered the sniff unreliable. Id. at 18-19. The Magistrate Judge also acknowledged Hernandez's argument that the canine's alert coincided with an alleged "nasal trespass" into the Fusion's open door but concluded that (1) suppression was not warranted because the dog acted on instinct, absent any evidence that officers guided it or facilitated entry into the vehicle, and (2) the issue was, in any case, moot because officers already had probable cause to search the car. Id. at 20-23.

As to the statements Hernandez made to law enforcement, the Magistrate Judge concluded that Hernandez was not subjected to custodial interrogation requiring Miranda warnings until the officers found the suspected methamphetamine in the trunk of the Fusion, id. at 28 (approximately the 18:00 minute mark of Gov. Ex. 1), but he recommended that Hernandez's statements be suppressed from that point—right after Trooper Munoz commented to her and

Cornejo, "you guys are in big trouble"—until Hernandez was provided her Miranda warnings by DEA Task Force Officer ("TFO") Michael Henao. Id. at 29-35.

On February 11, 2022, Hernandez filed her objections, arguing that the Magistrate Judge erred in concluding both that law enforcement officers had probable cause to search Hernandez's vehicle and that any of the statements Hernandez made to law enforcement that day were made voluntarily and in compliance with Miranda. Dkt. No. [299]. By Order of the Court, the Government filed a response on April 14, 2022. Dkt. No. [303].

## II.    MOTIONS TO SUPPRESS

Under 28 U.S.C. § 636, the Court reviews a Magistrate Judge's R&R for clear error if no objections are filed. 28 U.S.C. § 636(b)(1). If a party files objections, however, the district court must review de novo any part of the Magistrate Judge's disposition that is the subject of a proper objection. Id.

### A.    Motion to Suppress Fruits of the Vehicle Search

Hernandez contends that the Magistrate Judge erred in finding probable cause for the stop and search of the Fusion. Dkt. No. [299] at 10-16. She contends that although Trooper Munoz avers that he stopped the Fusion both because it was traveling in excess of the speed limit and because he believed he had the legal right to stop the vehicle based simply on the information he had been told about the vehicle's involvement in an apparent drug-trafficking transaction, the evidence does not support either explanation. Id. She points out that although

she was ostensibly pulled over for speeding, there is no physical record of such a violation and no citation, and during the stop the officers quickly abandoned the speeding allegation and instead began asking about drugs. Id. at 10-11. She also notes that Trooper Munoz testified that he intended to stop the Fusion "no matter what" because of what he had been told about the suspected drug-trafficking activity by the investigating agents. Id. at 11. She additionally contends that because there is a text record that agents observed drugs being removed from the Fusion at the processing house but no recorded observation that any agent surveilling the Fusion saw anything being placed in the trunk at the processing house, the agents could not reasonably believe that the car contained drugs at the time of the stop. Id. at 11-14.

The Court is not persuaded. As explained by the Magistrate Judge, the Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or other private property] without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980); United States v. Santa, 236 F.3d 662, 668 (11th Cir. 2000) (quoting Payton, id.); accord United States v. Arvizu, 534 U.S. 266, 273 (2002) (explaining that the Fourth Amendment's protection from "unreasonable searches and seizures" by government officials extends to "brief investigatory stops of persons or vehicles"). Once a defendant files a motion to suppress evidence garnered through a

warrantless search and seizure, the prosecution bears the burden to prove that the search was reasonable. United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983) (citing United States v. Impson, 482 F.2d 197 (5th Cir. 1973)). Thus, "[t]he Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment. Id.; accord Vale v. Louisiana, 399 U.S. 30, 34 (1970); United States v. Jeffers, 342 U.S. 48, 51 (1951).

Under the automobile exception to the Fourth Amendment search-warrant requirement, a warrantless search of a car is constitutional if the car is "readily mobile" and probable cause exists to believe that it contains contraband or evidence of a crime. United States v. Lanzon, 639 F.3d 1293, 1299-1300 (11th Cir. 2011); United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003). Probable cause exists to conduct a warrantless search when, "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." United States v. Tamari, 454 F.3d 1259, 1261-62 (11th Cir. 2006) (internal quotation marks omitted). Probable cause requires more than a mere suspicion but does not require the same "standard of conclusiveness and probability as the facts necessary to support a conviction." United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003) (quoting Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002)).

Whether a detention or search is based on the required level of knowledge can, in appropriate cases, be viewed in light of the "collective knowledge"

doctrine. This doctrine allows a court to impute the knowledge of other officers to the one who specifically engages in the search or other conduct at issue. See United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." (internal quotation marks omitted)). The collective knowledge of officers may be considered "if they maintained at least a minimal level of communication during their investigation." Willis, 759 F.2d at 1494.

The Court has reviewed the record de novo and finds that even if the officers did not see drugs being placed in the Fusion at the processing location, they nevertheless had probable cause to stop and search the vehicle.[5] Agents knew that Guerrero, who was in prison for trafficking methamphetamine, was using contraband cellular telephones to direct Cornejo and others outside prison in conducting methamphetamine trafficking and other related activities. Dkt. No. [278] at 22-23, 73-74. Investigating agents wiretapped the phones over a period of months and intercepted calls they believed to relate to methamphetamine trafficking. Id. For example, on February 28, 2020, Guerrero

---

[5]     Although the Court finds Trooper Munoz's testimony credible as to the speeding violation, Dkt. No. [278] at 97, 111-13, 125-26, the Government does not rely on the violation to establish probable cause. Thus, the undersigned likewise sets aside the question of whether speeding alone supplied probable cause for the stop and instead focuses on the collective-knowledge theory.

and Cornejo discussed, in code, what agents interpreted as Cornejo's need to dilute methamphetamine in water and flush it down the toilet, in an apparent effort to avoid being caught by police with drugs at her house. Id. at 30-36. During that call, Guerrero told her that police would need 24 hours and proof to get a search warrant, and Cornejo replied that the police didn't have any proof. Id. at 35. Guerrero and Cornejo were in frequent contact, generally multiple times each day. Id. at 38.

On the evening of March 17, 2020, agents intercepted a call between Guerrero and UM637 that they interpreted as a discussion about having methamphetamine ready for the next day. Id. at 38. UM637 asked Guerrero about the price he could get for the drugs and described them as "a little wet," which agents understood to mean that the drugs still needed more cooking time. Id. at 40-41. UM637 also made reference to someone bringing him something and picking something up from him the following day, which agents interpreted as UM637 discussing with Guerrero the fact that he would have the finished product ready the following day and was expecting to receive more product to cook at the same time. Id. at 41. UM637 stated that "at least 15 should come out," which agents took to mean there would be at least 15 kilograms of methamphetamine. Id. at 42. Based on the call, agents believed that Guerrero planned to have the drugs picked up from UM637 the following day, possibly by Cornejo. Id. At that point, agents had been able to determine the geolocation of UM637's phone. Id.

9

In response to the wiretap information, agents from the DEA, Homeland Security Investigations, and GSP set up surveillance on the morning of March 18, 2020, at Cornejo's house, an auto shop associated with UM122, and an address associated with UM637. Id. at 43. Throughout the surveillance, the agents communicated via cellular telephone, group text messages, and two-way radios. Id. at 45-46, 94. Trooper Munoz and TFO Henao participated in the surveillance and the group communications. Id. at 46-47, 83, 94-96, 133, 165.

At about 10:15 a.m., Guerrero and UM122 discussed the time frame of when he would be ready to provide product, and UM122 said he was leaving his house. Id. at 47-48. At about 10:52, TFO Henao sent out a text stating that UM122's vehicle was on the way to the shop. Id. at 50, 168. At about 10:58, Henao texted that pings placed Cornejo at her house. Id. On a call taking place at approximately 1:27 p.m., Guerrero asked UM637 if he could finish up a quinceanera, which agents understood to mean that Guerrero was asking if UM637 could have 15 kilograms of methamphetamine ready. Id. at 53-54. UM637 later responded that he had "14 ready" and had to check the temperature, which agents took to mean that he was still processing the drugs and had to check the temperature of them to see how much longer it would be before they were ready. Id. at 54, 56-57. Shortly after the 1:27 call, Guerrero and Cornejo spoke: Cornejo indicated to Guerrero that an unidentified woman would go with her to help transport something that had been cooked last night, and Guerrero indicated that he first wanted to get rid of whatever they had made. Id. at 54-57.

Agents understood this to mean that Guerrero wanted to sell the processed drugs quickly and not have them sitting in the same location where he had unprocessed drugs. Id. at 56. During the call, Guerrero and Cornejo also discussed further details about how Cornejo would travel around that day and the addresses she needed. Id. In a call taking place at 1:47 p.m., Cornejo told Guerrero that the female courier would meet her in about 10 minutes and that the two of them would be at UM122's location in about 40 minutes, and Guerrero asked her to pick up "two bucks," which the agents understood to be $2,000 to be given to UM637. Id. at 57-58. At that point, the agents believed that Cornejo and the other female courier were going to meet with UM122 to receive unfinished methamphetamine, would take the unfinished methamphetamine to UM637 to be cooked, would swap the unfinished methamphetamine for 14 kilograms of finished product, and would bring the finished product back to UM122, and they shared their theory with the other agents and troopers. Id. at 58-59.

At about 1:55 p.m., agents observed a silver-colored Ford Fusion pick up Cornejo and drive away. Id. at 60-61. The license plate number was shared to the chat. Id. at 60.

On a call taking place at about 3:36 p.m., Cornejo told Guerrero that they were pretty close to UM122's location and that they were there to "pick it up." Id. at 61-62. Her geolocation data placed her near the shop associated with UM122. Id. at 62. This was also shared on the chat, and the agents were able to observe the Fusion at the shop. Id. From there, the Fusion traveled to UM637's

processing location. Id. at 62-65. At 4:15 p.m., Cornejo told Guerrero that they were about 10 minutes away from the delivery location. Id. at 64. This was also shared on the group chat. Id.

Agents saw that two Hispanic males were at the processing house when the Fusion arrived at about 4:30 p.m. Id. at 65-66. The Fusion backed into the driveway, and one of the men retrieved a large box from the trunk of the vehicle and carried it into the house. Id.

At 4:34 p.m., Guerrero called Cornejo to see if they had completed the transaction and indicated that she should give $2,000 to the female courier. Id. at 67-68. This information was also shared among the surveillance team. Id. at 67-68, 71. The Fusion then left the community where the processing house was located and was stopped by Trooper Munoz at about 4:40 p.m. Id. at 68-69, 79-80, 92, 95, 99. The driver was identified as Hernandez, and the passenger was identified as Cornejo. Id. at 101-02.

Given the robust wiretap intelligence, and the repeated corroboration of that intelligence with surveillance evidence, e.g., the two female couriers, the timing of the stops, the locations of the stops, the delivery of a large box to the processing house, and payment of $2,000 payment, the Court finds it absolutely reasonable and credible for the task force team to believe that there was at least a fair probability that contraband or evidence of a crime—money and/or drugs discussed by Guerrero, Cornejo, and UM637—would be found in the Fusion when Trooper Munoz effected the traffic stop. Additionally, even if the agents did not

observe drugs being loaded into the Fusion at the processing house, the record shows that agents saw the Fusion back into the driveway, with the trunk toward the processing house; with their vision thus obscured, there was scant reason for them to have believed that the Fusion was in fact empty of all contraband and evidence of drug trafficking at that point.

For these reasons, the Court finds that there was probable cause for Trooper Munoz to stop and search the "Fusion, and, thus, the Court need not reach the arguments regarding the canine search. The Court will therefore adopt the Magistrate Judge's recommendation that it deny Hernandez's motion to suppress the fruits of the warrantless vehicle search.

## B.    Motion to Suppress Statements

Neither party filed objections to the Magistrate Judge's recommendation to grant Hernandez's motion to suppress statements as to the statements she made to Trooper Munoz from the time he commented to her, "you guys are in big trouble," until she was provided Miranda warnings by TFO Henao. Hernandez's filing also contains no objection to the Magistrate Judge's recommendation to deny the motion as to the statements Hernandez made to Trooper Munoz up to that point.[6] See Dkt. No. [299] at 10-27. The Court has therefore reviewed those

---

[6]    The Court recognizes that Hernandez's motion mentions that Trooper Munoz testified that he did not allow the women to use their cell phones and that he did not consider them free to leave the traffic stop. Dkt. No. [299] at 6. She did not, however, raise any argument based on those observations, see id. at 10-27, and the Court will not supply one. See N.L.R.B. v. McClain of Ga., Inc., 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to  authorities,  are  generally

portions of the R&R for clear error and finds none. Accordingly, the Court adopts those portions of the R&R as its opinion.

Hernandez objects to the portion of the R&R in which the Magistrate Judge recommended that the Court deny her motion to suppress the statements she made to TFO Henao after he read her Miranda rights. Id. at 23-27. In support, she argues that she never affirmatively waived the rights or indicated that she was willing to talk without a lawyer and that the officers created a "distinct 'hope of benefit'" that rendered her statements involuntary. Id. The Court is not persuaded by either argument.

The Supreme Court held in Miranda v. Arizona, 384 U.S. 436 (1966), that incriminating statements obtained during custodial interrogation must be considered involuntary and therefore excluded from evidence "unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of his right to remain silent and of the consequences of his failure to assert it." Minnesota v. Murphy, 465 U.S. 420, 430 (1984). When a defendant objects to the introduction of a statement to law enforcement as involuntary, due process requires that the trial court make an independent determination that the statement was voluntary before it may be heard by the jury. Jackson v. Denno,

---

deemed to be waived."); see also United States v. Langford, 647 F.3d 1309, 1331 (11th Cir. 2011) (quoting McClain). In any event, "a police officer's subjective views about whether a suspect is free to leave an interview do not bear on [the court's] objective analysis unless those views are conveyed to the suspect." United States v. Woodson, 30 F.4th 1295, 1304 (11th Cir. 2022).

378 U.S. 368, 391-92 (1964). For a custodial self-incriminating statement to be admissible, it is necessary for the Government to show that it complied with Miranda and that the statement was voluntarily made. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994).

Miranda requires that a suspect who is in custody be provided certain procedural safeguards: she must be advised that she had the right to remain silent, that any statement she makes may be used as evidence against her, and that she has a right to the assistance of counsel prior to any interrogation by law enforcement. Miranda, 384 U.S. at 444. She may waive the rights, so long as the waiver is made "voluntarily, knowingly, and intelligently." Id. There can be no questioning if the suspect unambiguously indicates that she does not wish to be interrogated or that she wishes to consult with an attorney before speaking. Hall v. Thomas, 611 F.3d 1259, 1285 (11th Cir. 2010) (citing Berghuis v. Thompkins, 560 U.S. 370, 380-81 (2010); Davis v. United States, 512 U.S. 452, 459 (1994)).

Given that Hernandez points out that she never affirmatively waived her Miranda rights or stated that she was willing to talk without a lawyer and that in response to TFO Henao's question, "Are you willing to answer some questions?", she responded, "I don't think I have much to tell you because I don't know much," she appears to suggest that Henao did not comply with Miranda. See Dkt. No. [299] at 23 (citing Dkt. No. [278] at 178, 191). However, the record shows that as Henao read Hernandez her Miranda rights, she confirmed that she acknowledged or understood her rights after he read each one to her. Dkt. No.

[278] at 190-94; Ex. 10 at 12:15-13:00. Moreover, Hernandez supplies no authority—and the Court knows of none—holding that Miranda requires that the suspect expressly waive her rights prior to questioning. Rather, an implicit waiver of Miranda rights is sufficient. Berghuis, 560 U.S. at 384 ("An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." (internal quotation marks omitted)); Hall v. Thomas, 611 F.3d 1259, 1285 (11th Cir. 2010). And Hernandez's statement that she did not have much to tell because she did not know much is not a refusal to be interrogated or a request for an attorney. Dkt. No. [278] at 178. For these reasons, the Court concludes that the Magistrate Judge did not err in finding that Hernandez received and waived her Miranda rights prior to questioning.

The Court has also carefully considered whether Hernandez's statements were elicited as a result of the officers making threats or creating a distinct "hope of benefit" for her if she answered questions, thereby rendering her statements involuntary. Dkt. No. [299] at 24-27. A statement is not voluntary if is obtained as a result of threats or promises. Malloy v. Hogan, 378 U.S. 1, 7 (1964); Bram v. United States, 168 U.S. 532, 542-43 (1897). "In other words[,] the person must not have been compelled to incriminate [her]self." Malloy, 378 U.S. at 7. A determination that a defendant's statements were involuntary "must include an element of official overreaching." Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988).

De novo review of the record shows that Hernandez's post-Miranda statements to TFO Henao were not involuntary. Hernandez correctly notes that before Trooper Munoz searched the Fusion, he told Hernandez that she should be honest about whether there were drugs in the car because if there were drugs in the car, she could "go away" for such a long time that her kids would have kids by the time she got out, Ex. 1 at 16:00, and that after he searched the car and found suspected methamphetamine in the trunk, he advised her and Cornejo that they were in a lot of trouble, id. at 17:45. Dkt. No. [299] at 9, 26. It is also true that after TFO Henao read Hernandez's Miranda rights to her and asked if she would answer questions, and she responded that there wasn't much she could answer because she didn't know much, he told her that whatever little information she would provide would go a long way with the prosecutor, Ex. 10 at 12:15-13:27. The interview recording additionally shows that twice when Hernandez supplied vague answers to questions, Henao again urged her to "help [her]self out" with the prosecution by answering the questions, id. at 15:11-15:50, 17:17-17:53, and that over the course of the post-Miranda portion of the interview, which lasted just under five minutes, Henao made seven references to Hernandez's opportunity to "help" herself by talking. Id. at 13:05-17:53.

However, Hernandez exaggerates when she states that TFO Henao's statements put her in "an impossible situation" by "telling her that her only salvation and the survival of her children is to tell him what she knows." Dkt. No. [299] at 26. She supplies no citation to the record, and after careful review, the

Court has been unable to unearth any such coercive language in the recordings.
See id.; see also Ex. 10. Instead, the record shows that Trooper Munoz gave
Hernandez a harsh but not unrealistic prediction regarding the amount of prison
time she could be facing for conspiracy to traffic 14 kilograms of
methamphetamine and that he and TFO Henao made the kind of generalized
statements about the benefits of cooperation that the Eleventh Circuit routinely
holds do not undercut voluntariness. See, e.g., United States v. Hipp, 644 F.
App'x 943, 947 (11th Cir. Mar. 1, 2016) (affirming voluntariness of statements
where agent told defendant he "need[ed] to talk" and "that it would probably be
in [the defendant's] best interest to cooperate, tell the truth, and possibly become
a witness for the government"); United States v. Chealy, 185 F. App'x 928, 932
(11th Cir. July 20, 2006) (affirming voluntariness of statements where officer told
defendant that the prosecution "could possibly do 'many things' on [a] drug
charge"); United States v. Mendoza-Cecelia, 963 F.2d 1467, 1475 (11th Cir. 1992)
(affirming the voluntariness of statements where official told defendant, "if you
don't cooperate with us, ten years can be a long time in jail. Anything can happen
and something can happen to your family, something can happen to your mother,
your father"), abrogated on other grounds, Coleman v. Singletary, 30 F.3d 1420,
1424 (11th Cir. 1994); United States v. Nash, 910 F.2d 749, 752-53 (11th Cir.
1990) (finding that promising defendant that his cooperation would be made
known to U.S. Attorney's office and advising him that "cooperating defendants
generally 'fared better time-wise'" did not amount to illegal inducement). "[A]

mere admonition to the accused to tell the truth does not render a [statement] involuntary," United States v. Vera, 701 F.2d 1349, 1364 (11th Cir. 1983), nor does "a general statement that cooperation may be beneficial to an accused, with no promise of leniency," Hipp, 644 F. App'x at 947; accord United States v. Davidson, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary.").

Thus, on the evidence of record, the Court concludes that the Magistrate Judge correctly determined that the agents did not make threats or promises that rendered Hernandez's waiver of rights involuntary or compelled her to speak with the agents. Her motions to suppress statements made to TFO Henao following her Miranda warnings are therefore due to be denied.

## C.   Conclusion

For all of these reasons, the Court **OVERRULES** Hernandez's objections, Dkt. No. [306], and **ADOPTS** the Magistrate Judge's Report and Recommendation, Dkt. No. [295], as its opinion: Hernandez's Motion to Suppress Search and Seizure, Dkt. No. [127], is **DENIED**; her Supplemental Motion to Suppress, Dkt. No. [242] is **DENIED** to the extent that she seeks suppression of the fruits of the vehicle search; and her Motion to Suppress Statements, Dkt. No. [128], and Supplemental Motion to Suppress, Dkt. No. [242], are **GRANTED** so far as they seek to suppress statements Hernandez

made from the time the methamphetamine was discovered in the Fusion's trunk until her receipt of <u>Miranda</u> warnings and **DENIED** so far as they seek to suppress other statements made by Hernandez to law enforcement.

### III.   ORDER SETTING TRIAL

The Court hereby sets the trial in this case to begin on **Friday, November 4, 2022, at 9:30 AM** in Courtroom 2107, United States Courthouse, 75 Ted Turner Drive, S.W., Atlanta, Georgia. The pretrial conference is set for Monday, October 17, 2022, at 1:30 PM in Courtroom 2107.

By noon on Monday, October 3, 2022, the parties are to file their respective motions in limine and voir dire questions. By noon on Monday, October 3, 2022, the Government is to file a brief statement of facts the parties can rely on for voir dire. By noon on Monday, October 10, 2022, the parties are to file any objections to those items listed above. Requests to charge and verdict forms should be filed on CM/ECF and e-mailed to the Courtroom Deputy Clerk in Word format by noon on Thursday, November 3, 2022. The time from May 10, 2022, to November 4, 2022, shall be excluded from computation under the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(7)(A), (h)(7)(B)(i), and (h)(7)(B)(iv).

The Court requires the parties to e-mail an exhibit and witness list to the Courtroom Deputy Clerk by Thursday, November 3, 2022. The list shall contain an identifying description of each exhibit to the right of the exhibit numbers. The list shall be double spaced with approximately 1.5 inches of space to the left of the number for court use. Additionally, the parties are required to deliver to

chambers the morning of trial a tabbed exhibit notebook for the Court's use. Counsel shall comply with the Local Rules of this Court regarding exhibits. Any exhibit larger than 8 ½" x 11" will be returned to counsel pursuant to LR 79.1(B)(5), NDGa. Within ten (10) days following the conclusion of a trial or hearing, all parties must file photographs or other appropriate reproductions of oversized and non-documentary exhibits admitted as evidence at the trial or hearing. The parties must provide a courtesy copy of any documents e-filed just prior to trial or on any day during the course of the trial.

Courtroom 2107 is technology equipped. Any training or trial runs regarding the courtroom technology must be scheduled in advance of trial via the Courtroom Deputy Clerk. The Court will not allow time for training or trial runs at the beginning of the trial. Any motions requesting leave to bring technology into the courtroom must be filed prior to the pretrial conference, to allow time for proper notification to the U.S. Marshals Service.

It is the responsibility of counsel to immediately notify the Courtroom Deputy if a defendant requires interpretive services for any court proceeding so that services can be arranged. It is the responsibility of counsel to arrange interpretive services for any witnesses needing assistance of an interpreter for any court proceeding.

**IT IS SO ORDERED** this 12th day of May, 2022.

**Leigh Martin May**
**United States District Judge**